**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ADRIAN DA COSTA,** *et al.*, | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 22-1576 (JEB)** |
| **IMMIGRATION INVESTOR PROGRAM OFFICE,** *et al.*, | |
| **Defendants.** | |

**MEMORANDUM OPINION**

In a twist on the celebrated Field of Dreams revelation, the EB-5 Regional Center Program instructs immigrants that if you build it — or invest in it — you may come. The program sets aside visas for individuals who indirectly create at least ten jobs for U.S. workers by making a substantial capital investment in a designated "regional center" — as opposed to in an Iowa cornfield. South African Plaintiffs Adrian and Jayde Da Costa sought to take advantage of that program. They invested in a California-based regional center and submitted an application, known as a Form I-526, to U.S. Citizenship and Immigration Services for an EB-5 visa in November 2019. They have yet to hear back. Plaintiffs therefore filed this suit to compel the agency to act. The Da Costas allege that the Government's delay in processing their Form I-526 is unreasonable. This is particularly so given that USCIS, they believe, unlawfully refused to do anything during a nine-month period when the agency contended that its applicable statutory authority had expired. Defendants, the Immigrant Investor Program Office within USCIS and Ur Jaddou, Director of USCIS, now move to dismiss. Believing both that USCIS

1

correctly ceased certain adjudications for nine months and that the delay is not yet excessive, the Court will grant the Motion.

## I.   Background

### A.   Legal Background

#### 1.   *Statutory Authorization for Regional Center Program*

In 1990, Congress through the Immigration and Nationality Act (INA) established a program that sets aside visas for immigrants who help create jobs for American workers. See Immigration Act of 1990, Pub. L. No. 101-649, § 121(a), 104 Stat. 4978, 4987 (1990) (codified at 8 U.S.C. § 1153(b)(5)). These so-called "EB-5 visas" are available to applicants who make a hefty capital investment in a commercial enterprise (ranging from $500,000 to $1,800,000, depending on the date and target of the investment) that will directly create at least ten full-time jobs in the United States. See 8 U.S.C. § 1153(b)(5)(A); Sychev v. Jaddou, No. 20-3484, 2022 WL 951378, at *1 & n.2 (D.D.C. Mar. 30, 2022).

Two years later, Congress paved an alternative path to an EB-5 visa: the "Pilot Immigration Program," now known as the Regional Center Program. See Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1993 (1993 Appropriations Act), Pub. L. No. 102-395, § 610, 106 Stat. 1828, 1874 (1992) (codified at 8 U.S.C. § 1153 note). Under that program, immigrant investors may "satisfy the EB-5 employment-creation requirement by creating jobs indirectly" through a minimum investment into a designated "regional center." Bromfman v. USCIS, No. 21-571, 2021 WL 5014436, at *2 (D.D.C. Oct. 28, 2021); USCIS, EB-5 Immigrant Investor Pilot Program, https://perma.cc/NTQ8-H7HT. A regional center is an "economic unit, public or private, which is involved with the promotion of economic growth, including increased export sales, improved

2

regional productivity, job creation, and increased domestic capital investment."  8 C.F.R.

§ 204.6(e).  To become a designated "regional center" for EB-5 purposes, a proposed center must

submit a petition with proof that it will, among other things, have a positive impact on the local

and national economy.  Id. § 204.6(m).

Section 610 of the 1993 Appropriations Act, which established the then-pilot program,

originally read as follows:

> Section 610.    Pilot Immigration Program.—(a) Of the visas
> otherwise available under section 203(b)(5) of the Immigration and
> Nationality Act (8 U.S.C. 1153(b)(5)), the Secretary of State,
> together with the Attorney General, shall set aside visas for a pilot
> program to implement the provisions of such section. Such pilot
> program shall involve a regional center in the United States for the
> promotion of economic growth, including increased export sales,
> improved regional productivity, job creation, and increased
> domestic capital investment.
>
> (b) For purposes of the pilot program established in subsection (a),
> beginning on October 1, 1992, but no later than October 1, 1993, the
> Secretary of State, together with the Attorney General, shall set
> aside 300 visas annually for five years to include such aliens as are
> eligible for admission under section 203(b)(5) of the Immigration
> and Nationality Act and this section, as well as spouses or children
> which are eligible, under the terms of the Immigration and
> Nationality Act, to accompany or follow to join such aliens.

8 U.S.C. § 1153 note (repealed by EB-5 Reform and Integrity Act of 2022, Pub. L. 117-103,

§ 103(a), 136 Stat. 1070, 1075 (2022)).

Because § 610(b) as enacted authorized only five years of visa set-asides, Congress for

decades periodically reauthorized the Regional Center Program, and it typically did so by

amending § 610(b).  See, e.g., Visa Waiver Permanent Program Act, Pub. L. 106-396, § 402(a),

114 Stat. 1637, 1647 (2000) (extending set-aside period to ten years).  In 2020, Congress

amended § 610(b) for the last time to extend the set-aside until June 30, 2021.  See Consolidated

Appropriations Act of 2021, Pub. L. No. 116-260, Div. O, § 104, 134 Stat 1182, 2148 (2020)

3

("Section 610(b) . . . shall be applied by substituting 'June 30, 2021' for 'September 30, 2015.'").

Earlier this year, however, our legislature overhauled the program. Motivated in part by a desire to curb the corruption that had plagued regional centers for years, Senators Leahy and Grassley introduced the EB-5 Reform and Integrity Act. See Leahy Press Release, Leahy, Grassley Introduce EB-5 Investor Visa Integrity Reform Bill (Mar. 18, 2021), https://perma.cc/T2UB-T794. The bill was signed into law on March 15, 2022. There was thus an approximately nine-month gap in authorization from June 2021 until March 2022. The Integrity Act introduced a host of reforms to EB-5 visa processes, including the repeal of § 610 and the reauthorization of the Regional Center Program through 2027. See EB-5 Reform and Integrity Act of 2022, Pub. L. 117-103, § 103, 136 Stat. 1070, 1075 (2022) (codified at 8 U.S.C. § 1153(b)(5)(E)).

2. *Application Process*

Acquiring an EB-5 visa through the Regional Center Program requires wading through a Byzantine web of immigration laws and regulations. Stripped down to its basics, however, the process proceeds generally as follows. Immigrant investors must first file a petition (known as an I-526 petition or form) with the requisite fees, evidence of their investment, and other supporting documents. See 8 C.F.R. § 204.6(a); ECF No. 11 (MTD) at 3. USCIS will then adjudicate the petition. Once an immigrant investor's petition is approved, she may apply for two-year conditional-permanent-resident status. See MTD at 3. At the end of that two-year period, the immigrant may petition to remove the conditions on her residence by filing a Form I-829. See USCIS, I-829, Petition by Investor to Remove Conditions on Permanent Resident Status (last updated Apr. 29, 2022), https://www.uscis.gov/i-829.

Approval of the I-526 form is thus the most crucial step in obtaining an EB-5 visa. It is, however, only part of the battle. An immigrant may obtain a visa only if her Form I-526 is approved and a visa is otherwise available for individuals like her. That is no small ask. The total number of employment-based visas that may be issued each year is very limited, and the same goes for the subcategory of EB-5 visas. See 8 U.S.C. §§ 1151(d), 1153(b)(5)(A). Visas available to investors in regional centers form a further subset of the EB-5 subset. In short, the absolute number of visas available to regional-center investors is low. These visas are also subject to the INA's per-country caps, which place limits on the issuance of visas to individuals from certain countries. For employment-based visas like the EB-5, only 7% of those visas may be made available to individuals from any single country annually. See 8 U.S.C. § 1152(a)(2).

To better juggle the various extrinsic limitations on visas for regional-center investors, USCIS recently announced a change to its I-526 adjudication process. While the agency previously employed a "first-in, first-out" method — as the name suggests, under that rule petitions were generally processed in the order in which they were submitted — it has since switched to an "availability approach." USCIS, USCIS Adjusts Process for Managing EB-5 Visa Petition Inventory (Jan. 29, 2020), https://perma.cc/R4UW-2VZM. Under that method, priority is given to "petitions where visas are immediately available, or soon available," which permits "[a]pplicants from countries where visas are immediately available . . . to use their annual per-country allocation of EB-5 visas." Id. In other words, an immigrant who filed earlier than another but hails from a country that has already met its per-country cap for visas for that year may find herself behind the other applicant.

B.  Factual Background

Plaintiffs Adrian and Jayde Da Costa are citizens of South Africa.  See ECF No. 9 (Amended Complaint), ¶ 78.  The married couple resides in Durban, a city that, according to Plaintiffs, struggles with poor infrastructure, natural disasters, violent riots, and general "lawlessness."  Id., ¶¶ 79–85.  Seeking to escape those conditions, the Da Costas decided to try their luck with the Regional Center Program.  They invested $500,000 in Otay Village 8 Lender, LLC, an entity that exists to pool funds for a large residential and commercial development in California.  Id., ¶¶ 87, 89.  Otay Village is affiliated with Discovery California, LLC, which is a designated regional center.  Id., ¶ 88.  The development is projected to create over 4,000 jobs, which is enough to support the petitions of all immigrant investors in Otay Village.  Id., ¶ 91.  At this stage, the Court accepts as true that Plaintiffs fulfilled the investment and employment-creation requirements for an EB-5 visa through the Regional Center Program.

Relying on this investment, the Da Costas submitted a Form I-526 to USCIS on November 12, 2019.  Id., ¶ 75.  They are still awaiting an adjudication of this petition.  Id., ¶¶ 97–101.  In addition, between June 30, 2021 — the most recent expiration date in § 610(b) — and the passage of the Integrity Act on March 15, 2022, USCIS stopped processing I-526 forms submitted under the Regional Center Program, including the Da Costas' form.  See USCIS, EB-5 Reform and Integrity Act of 2022 Listening Session at 4 (Apr. 29, 2022), https://perma.cc/T2K9-YKCU.  The agency resumed processing petitions once the Integrity Act became law.  See MTD at 7.

The Da Costas allege that the delay in adjudication is causing their family substantial harm, including financial damage stemming from the fact that they must sustain their investment

in Otay Village while their petition is pending. Id., ¶¶ 98, 100. Fed up with waiting, Plaintiffs filed this suit on June 3, 2022. See ECF No. 1 (Complaint).

The operative Complaint contains three counts. The first two allege that USCIS violated the Administrative Procedure Act when it suspended processing of Forms I-526 during the authorization gap for the Regional Center Program. See Am. Compl., ¶¶ 103–24. According to Plaintiffs, that decision was contrary to law and an unlawful withholding of agency action because § 610(a) remained operative and required USCIS to continue processing I-526 petitions even if § 610(b)'s authorization had expired. Id., ¶¶ 114, 121. The third count alleges that USCIS's delay in adjudicating their Form I-526 is unreasonable and thus also in violation of the APA. Id., ¶¶ 125–96. Defendants now move to dismiss.

## II.    Legal Standard

Federal Rule of Civil Procedure 12(b)(6) permits dismissal of a complaint for failure to state a claim upon which relief may be granted. In evaluating such a motion to dismiss, courts must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)). Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570) — that is, the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. A court need not accept as true, then, "a legal conclusion couched as a factual allegation," Trudeau v. Fed. Trade Comm'n, 456 F.3d 178, 193

(D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)), nor "inferences . . . unsupported by the facts set out in the complaint." Id. (quoting Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994)).  And it may consider not only "the facts alleged in the complaint," but also "any documents either attached to or incorporated in the complaint[,] and matters of which [courts] may take judicial notice." Equal Emp. Opportunity Comm'n v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997).  The latter category includes information posted on official public websites of government agencies.  See, e.g., Pharm. Rsch. & Mfrs. of Am. v. Dep't of Health & Hum. Servs., 43 F. Supp. 3d 28, 33–34 (D.D.C. 2014); Fed. R. Evid. 201(b)(2), 201(d).

### III.    Analysis

The Court will begin by considering Plaintiffs' standing to bring the first two counts, which assail USCIS's pause on processing during the nine-month sunset period.  Having determined that they do have standing, it will next examine the merits of those claims.  Finally, the Court will evaluate the unreasonable-delay cause of action.

### A.   Standing

Defendants initially contend, in very cursory fashion, that Plaintiffs lack standing to challenge USCIS's decision to cease processing I-526 forms from June 30, 2021, to March 15, 2022.  See MTD at 18.  The Court disagrees.  Assuming Plaintiffs' success on the merits, which the Court must in a standing analysis, the Government's cessation of processing added nine months to whatever length of time the Da Costas have to wait for their petition to be approved. In other words, at least some of the delay in processing their application is traceable to the nine-month pause.  In the context of the unreasonable-delay claim, Defendants do not dispute that an increased delay in adjudication of the Da Costas' Form I-526 is an injury sufficient to support

standing. There is no apparent reason why that same logic would not apply to the first two counts. Given that they have standing to bring their unreasonable-delay claim, Plaintiffs thus also have standing as to their first two counts.

B. Authorization Gap

In Counts I and II, Plaintiffs maintain that USCIS's decision to halt processing of Forms I-526 during the authorization gap was contrary to law and unlawfully withheld agency action. Specifically, they assert that even after June 30, 2021, USCIS retained the authority — and in fact had an obligation — to set aside visas for the Regional Center Program and to continue processing Forms I-526 from immigrant investors seeking such visas. They rely on two arguments in support of that proposition. First, they note that § 610(a) by its terms does not expire. Notwithstanding the expiration of § 610(b), then, § 610(a) provided the necessary authorization for USCIS to continue processing visas for the program between June 30, 2021, and March 15, 2022. Second, the Da Costas contend that Defendants' position in this action contradicts the stance they took in a separate case also involving the Regional Center Program: Behring Regional Center v. Mayorkas, No. 22-2487, 2022 WL 2290594 (N.D. Cal. June 24, 2022). See ECF No. 13 (Pl. Opp.) at 16. According to Plaintiffs, the agency in Behring conceded that § 610(a) authorized it to continue regulating regional centers even during the authorization gap. Id. at 16–18. That concession, the Da Costas insist, renders the agency's position in this action unlawfully contradictory.

This Court will begin with the pure interpretive question — that is, did § 610 authorize USCIS to set aside visas for the Regional Center Program between June 30, 2021, and March 15, 2022, and therefore authorize the agency to continue processing Forms I-526? The Court will then evaluate the effect, if any, of the Government's position in Behring on this action.

1.  *Interpretive Question*

Section 610(a) provided that "[o]f the visas otherwise available under section 203(b)(5) . . . , the Secretary of State . . . <u>shall set aside visas for a pilot program to implement the provisions of such section</u>." (emphasis added). Section 610(b) then elaborated on that authorization. It stated that for "purposes of the pilot program established in subsection (a), . . . . the Secretary of State . . . shall set aside" a limited number of visas annually for a certain period of time. No one contests that for purposes of § 610(b) alone, authorization expired on June 30, 2021. The only question is whether § 610(a)'s language — "shall set aside visas" — authorized USCIS to continue processing new applications and issuing visas under the program despite § 610(b)'s expiry. The Court answers that question in the negative.

Start at the beginning, with the title of the provision. Section 610 was originally titled "Pilot Immigration Program." The rest of the statute then continued to refer to the program as the "pilot program." Id. To be sure, once Congress started periodically reauthorizing the program, it "became a 'pilot' in name only." Behring, 2022 WL 2290594, at *2. But the original nomenclature leaves no question that the Congress that enacted the program envisioned it as a "pilot." As any TV-series fan will know, that term suggests that the program was provisional by design — a test-run, so to speak, not a permanent commitment. Defendants' reading aligns with that vision. Under their interpretation, the core of § 610 as enacted was drafted to expire after five years, and the precise mechanism for that expiration lay in § 610(b)'s limited authorization of visa set-asides. That would render the proposal a true pilot program: one that can be renewed if it works and nixed if it does not. By contrast, Plaintiffs argue that Congress gave USCIS permanent authority to set aside visas for the program. Under that reading of § 610(a), though,

10

the program would not be a "pilot" at all; indeed, it would be quite the opposite. Defendants' reading is the only one aligned with Congress's purpose as expressed in the text of § 610.

An inspection of § 610(b) confirms that Defendants' reading is correct. Recall that this subsection as originally enacted contained a clear cut-off date for the setting aside of visas: five years from the start of the program, which was to be anytime between October 1, 1992, and October 1, 1993. Plaintiffs' reading of § 610 would render subsection (b) superfluous. If § 610(a) alone authorized the Secretary of State to set aside visas for the "pilot program" in perpetuity, then subsection (a) would swallow the time limit contained in subsection (b). In Plaintiffs' world, USCIS could have blown right past the five-year clock contained in subsection (b) because subsection (a) permitted it to set aside visas for however many years it wished. Defendants' reading, by contrast, gives independent meaning to § 610(b) by rendering the time limit in that provision significant.

Reading both subsections together confirms that Defendants are correct. Section 610(b) plainly refers back to subsection (a): it begins with the introductory phrase, "For purposes of the pilot program established in subsection (a)." The most natural reading of subsection (b), then, is that it elaborates on the limitations of the "pilot" established in the preceding subsection. It answers the natural questions that follow the establishment of a pilot program: how long will the pilot last? How extensive will the program be? And it provides more granular guidance on the vague instruction offered by § 610(a). When Congress said that the Secretary of State shall set aside visas for the pilot program, how many visas was it envisioning, and for how many years was the Secretary to set those aside? Section 610(b) gives us the answer.

Finally, subsequent statutory history suggests that the Congresses that followed the enacting one interpreted § 610 in the same way Defendants do: that when § 610(b) expires, the

11

authorization for issuing visas for the program expires. If § 610(a) alone gave USCIS authority to set aside visas, Congress would have no need to amend § 610(b), unless it wished to repeal the program altogether. Yet it has done just that many times over the past few decades. See supra section I.A.1. Plaintiffs' reading renders those frequent reauthorizations meaningless. It is also notable that each time Congress amended § 610(b), it had the option to eliminate the expiration date contained in the provision. But each time, the legislature instead replaced the old expiration date with a new one. That confirms Congress's intent: USCIS's authority to set aside visas for the Regional Center Program was to be temporally limited.

The Court's holding is thus consistent with the manner in which other courts in this district have characterized USCIS's authority to act on Forms I-526 after June 30, 2021. See Mokkapati v. Mayorkas, No. 21-1195, 2022 WL 2817840, at *6 (D.D.C. July 19, 2022) ("USCIS was unable to act on plaintiffs' petitions . . . given the lapse of statutory authorization for the Regional Center Program between June 2021 and March 2022."); Sharifullin v. Blinken, No. 21-728, 2022 WL 558191, at *3 (D.D.C. Feb. 24, 2022) (dismissing request for adjudication on EB-5 application because Regional Center Program expired on June 30, 2021, and courts "cannot compel USCIS to do what Congress has not authorized it to do"); Bromfman, 2021 WL 5014436, at *2 ("[T]he Regional Center Program's statutory authorization reached its sunset on June 30, 2021. Congress ha[d] yet to reauthorize the program [as of October 2021].").

    2. *Behring*

Not so fast, rejoin the Da Costas. They point to the Government's representations in Behring, which they assert are at odds with its position here. According to Plaintiffs, the agency in Behring admitted that it "had the authority under the law to adjudicate pre-existing Regional Center programs and continued to regulate pre-existing Regional Centers during the nine month

12

'lapse.'" Opp. at 16.  Defendants respond that there is no inconsistency between that position and the one they stake out here.  See ECF No. 14 (Reply) at 9.  That the Government believed it had authority to continue regulating existing regional centers does not necessarily mean it also believed it "had authority to continue adjudicating or granting I-526 petitions." Id.  The agency believes that it was reasonable to assert that regional centers with investments from approved investors could continue to operate even while USCIS remained unable to set aside visas for new investors.

While the parties spend significant time on the question, this Court need not venture into the weeds of the Government's representations in Behring.  Plaintiffs challenge the pause in adjudication on the grounds that it is contrary to law and unlawfully withheld agency action.  See Am. Compl., ¶¶ 116–17, 123–24.  The only question before this Court as to those counts, then, is whether § 610 in fact established the authority and obligation for USCIS to continue adjudicating and processing Forms I-526 for the Regional Center Program after June 30, 2021.  Because the statute's plain language answers that question in the negative, as the Court just explained, it is irrelevant what the Government has said in other actions concerning the Regional Center Program.

In any event, the issue on which the Government took a position in Behring is not before this Court.  The agency there claimed that it had authority to continue to regulate existing regional centers even during the authorization gap.  See Opp. at 6 (citing Behring, 2022 WL 2290594).  It also defended its authority to process I-829 forms during that period.  Behring, ECF No. 58 (Transcript of June 6, 2022, Hearing) at 30:7-8.  Recall that an immigrant investor with an approved Form I-526 can file a Form I-829 to apply for permanent (as opposed to conditional) residency after her first couple of years in the United States.  Id. at 28:3-8.

13

Plaintiffs, understandably, do not challenge either authority, so it is not within this Court's purview to opine on those questions.

Perhaps the Da Costas meant to press a general "arbitrariness" or judicial-estoppel challenge to the Government's alleged flip-flopping, objecting not to the decision to stop processing petitions but to the Government's adoption of allegedly inconsistent positions here and in Behring. See Opp. at 17. Such a claim, however, is nowhere to be found in the Amended Complaint. But even if it were, it would go nowhere. USCIS could plausibly determine that a regional center, once designated, may continue to be regulated in perpetuity, while also asserting that its authority to adjudicate new visa petitions under the program is time limited by § 610(b). It could also defend its authority to process I-829 forms, which merely finalize the green-card process for investors for whom a visa was already set aside and approved through the regional center program, while defending its lack of authority to set aside visas for new investors who have yet to be approved. The agency's purported position, as stated here, is that § 610(b) sets an expiration date only for the setting aside of visas; § 610(a), meanwhile, "creates the program and is the source of authority to regulate regional centers" and has no expiration date. See Reply at 9–10. Reserving judgment on whether the statute permits such a reading, it is at least an internally consistent position.

C. Unreasonable Delay

Regardless of Defendants' obligations during the nine-month gap, Plaintiffs in Count III independently allege that the delay in adjudicating their Form I-526 is unreasonable. To evaluate the reasonableness of a delay in agency action, courts examine six factors set out in Telecommunications Research & Action Center v. FCC (TRAC), 750 F.2d 70 (D.C. Cir. 1984):

> (1) the time agencies take to make decisions must be governed by a rule of reason;

> (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason;
> (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake;
> (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority;
> (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and
> (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

Id. at 80 (internal quotations, citations, and emphasis omitted); see also Mashpee Wampanoag Tribal Council, Inc. v. Norton, 336 F.3d 1094, 1100 (D.C. Cir. 2003).  These six factors "are not 'ironclad,' but rather are intended to provide 'useful guidance in assessing claims of agency delay.'"  In re Core Commc'ns, Inc., 531 F.3d 849, 855 (D.C. Cir. 2008) (quoting TRAC, 750 F.2d at 80).  "Each case must be analyzed according to its own unique circumstances," as each "will present its own slightly different set of factors to consider."  Air Line Pilots Ass'n, Int'l v. Civil Aeronautics Bd., 750 F.2d 81, 86 (D.C. Cir. 1984).  Whether a delay is unreasonable "cannot be decided in the abstract, by reference to some number of months or years beyond which agency inaction is presumed to be unlawful, but will depend in large part . . . upon the complexity of the task at hand, the significance (and permanence) of the outcome, and the resources available to the agency."  Mashpee, 336 F.3d at 1102.

The considerations contemplated by the TRAC factors can be grouped into four basic inquiries.  "First, is there any rhyme or reason — congressionally prescribed or otherwise — for [an agency]'s delay (factors one and two)?  Second, what are the consequences of delay if the Court does not compel the [agency] to act (factors three and five)?  [Third], how might forcing the agency to act thwart its ability to address other priorities (factor four)?"  Ctr. for Sci. in the

15

Pub. Int. v. United States Food & Drug Admin., 74 F. Supp. 3d 295, 300 (D.D.C. 2014).  Finally, is the delay intentional or due to any impropriety on the part of the agency (factor six)?

Before tackling those factors, the Court briefly addresses Plaintiffs' threshold arguments that courts should not dismiss unreasonable-delay claims before discovery, and that discovery is specifically necessary here to evaluate the "actual reasons" for the delay in processing Plaintiffs' I-526 petition.  See, e.g., Am. Compl., ¶¶ 132–33, 136.  There is no categorical prohibition on deciding unreasonable-delay claims at the motion-to-dismiss stage, so the question of whether discovery is necessary depends, as with any sort of claim, on the particular Complaint.  If a "record contains enough facts to evaluate the TRAC factors" at that point, then a Court may appropriately decide to do just that.  Sarlak v. Pompeo, No. 20-35, 2020 WL 3082018, at *5 (D.D.C. June 10, 2020) (collecting cases and evaluating TRAC factors on motion to dismiss); see also Dastagir v. Blinken, 557 F. Supp. 3d 160, 163–64 (D.D.C. 2021); Zandieh v. Pompeo, No. 20-919, 2020 WL 4346915, at *5 (D.D.C. July 29, 2020).  For reasons that will become clear in the analysis that follows, this Court concludes that the facts alleged in the Complaint, coupled with facts of which the Court may take judicial notice, permit it to adequately evaluate the TRAC factors without discovery.

1.  *Reasonableness (Factors 1 and 2)*

The first two TRAC factors weigh in Defendants' favor.  They require courts to assess "whether the agency's response time complies with an existing specified schedule and whether it is governed by an identifiable rationale."  Ctr. for Sci. in the Pub. Interest, 74 F. Supp. 3d at 300. USCIS contends that it applies a rule of reason to the processing of Forms I-526: the availability method.  See MTD at 10.  The agency adds, moreover, that among applicants for whom a visa is or soon will be available, the "first-in, first-out" method supplements the availability method.

16

Id.; USCIS, Questions and Answers: EB-5 Immigrant Investor Program Visa Availability Approach (last updated Apr. 2, 2021), https://perma.cc/SMS4-SLQC ("Workflows are generally managed in FIFO order when a visa is available or will be available soon.").

That is an identifiable rationale.  It is also entirely justified in light of the agency's stated priorities.  The availability method ensures that candidates for whom a visa is available have their applications processed in a timely manner.  See MTD at 10.  The method also "allows qualified EB-5 petitioners from traditionally underrepresented countries to have their petitions approved in a more timely fashion."  Id.  This Court thus joins various others from this district in concluding that the availability approach as employed by USCIS provides a solid rule of reason for processing I-526 petitions.  See, e.g., Thakker v. Renaud, No. 20-1133, 2021 WL 1092269, at *6 (D.D.C. Mar. 22, 2021) ("[The availability approach] provides an 'identifiable rationale' for Defendant's approach to processing I-526 petitions."); Palakuru v. Renaud, 521 F. Supp. 3d 46, 51 (D.D.C. 2021) ("[T]he Government's process for adjudicating I-526 petitions is governed by a rule of reason."); Nohria v. Renaud, No. 20-2085, 2021 WL 950511, at *6 n.5 ("The agency's process is clearly governed by a solid rule of reason — the visa availability approach — meeting the first factor."); Jain v. Renaud, No. 21-3115, 2021 WL 2458356, at *4 (N.D. Cal. June 16, 2021) (noting all district courts that considered question found that visa-availability approach satisfies first TRAC factor).

Plaintiffs nonetheless mount four separate objections to that reasoning.  First, they contend that Defendants must not have applied the availability approach to their I-526 form because they have yet to receive an adjudication despite a visa being available to them.  See Am. Compl., ¶ 144; Opp. at 22–23.  "Plaintiffs' arguments, however, fail to account for other petitioners in precisely the same situation who may have filed their petitions earlier."  Thakker,

2021 WL 1092269, at *6 (emphasis omitted).  After all, USCIS supplements the availability method with a FIFO method among petitions for which a corresponding visa is available.  See MTD at 10.

Next, the Da Costas suggest that the agency's practice of granting "blanket expedites" to some forms is inconsistent with its purported rule of reason and thus demonstrates USCIS's failure to follow it in practice.  See Opp. at 23; Am. Compl., ¶¶ 149–53.  To begin, the allegation that USCIS issues such expedites is conclusory and devoid of factual support.  Indeed, for that proposition, the Da Costas cite only a single website — eb5fast.com — that is a naked recruitment tool operated by a regional-center project seeking more investments from immigrants.  See https://perma.cc/4S22-F5KH (touting Appalachian EB-5 Regional Center and Tryon International Equestrian Center as a "world class EB-5 project with the fastest visa process").  The center's unverified representations of the processing speed for I-526 petitions for its project do not assist the Court in assessing Defendants' actual practices.  In any event, the website currently states that investors in "rural projects (like Tryon) have substantial advantages" including "priority processing."  Id.  That prioritization for rural projects, however, does not undermine the existence of a rule of reason.  It exists by virtue of statutory command and must thus be encompassed within any rule of reason.  See 8 U.S.C. 1153(b)(5)(E)(ii)(I) (providing that in processing petitions for regional-center program, Secretary of Homeland Security "shall prioritize the processing and adjudication of petitions for rural areas").

The Court notes that at some point, the website appears to have advertised "expedited processing" for its investors.  See https://perma.cc/4S22-F5KH; Am. Compl., ¶ 149.  But Defendants have an answer to that, too.  The agency entertains expedite requests supported by extensive documentation, but it evaluates those requests on a "case-by-case basis."  USCIS, How

18

to Make an Expedite Request (last updated Oct. 20, 2022), https://perma.cc/G47V-L2VF.  The

Da Costas filed no such request, so their petition was presumptively subject to the default

processing rule.  They may not now complain that other petitions benefited from a process they

never sought to use.  In sum, Plaintiffs fail to plausibly allege any facts showing that Defendants

strayed from their rule of reason in this case.

Plaintiffs next more broadly posit that the congressionally provided rule of reason is 180

days, and Defendants have blown past that so-called guidepost.  See Am. Compl., ¶ 160 (citing 8

U.S.C. § 1571(b)).  Title 8 U.S.C. § 1571(b) provides: "It is the sense of Congress that the

processing of an immigration benefit application should be completed not later than 180 days

after the initial filing of the application."  But "a sense of Congress resolution is not law."

Emergency Coal. to Defend Educ. Travel v. Dep't of Treasury, 545 F.3d 4, 14 n.6 (D.C. Cir.

2008).  The Court is thus persuaded that the language in § 1571(b) is merely hortatory.  See

MTD at 13.  That makes particular sense in this context, since "Congress has given the agencies

wide discretion in the area of immigration processing."  Skalka v. Kelly, 246 F. Supp. 3d 147,

153–54 (D.D.C. 2017); see also Palakuru, 521 F. Supp. 3d at 51 (finding that § 1571(b) is

"nonbinding").

Finally, in a similar vein, the Da Costas assert that the amount of time they have been

waiting is *per se* unreasonable.  See Opp. at 22.  As a threshold matter, the Court agrees with

Defendants that in calculating the length of Plaintiffs' wait time, the roughly nine-month period

between June 30, 2021, and March 15, 2022, should be excluded.  See MTD at 11; see also

Bromfman, 2021 WL 5014436, at *4 (noting that Court lacked authority to order agency to act

on I-526 petition for regional-center program during authorization gap).  Because the Da Costas

filed their petition on November 12, 2019, see Am. Compl., ¶ 75, it has been pending for roughly

19

27 months excluding the authorization gap. "Although no bright lines have been drawn in this context, district courts have generally found that immigration delays in excess of five, six, seven years are unreasonable, while those between three to five years are often not unreasonable." Mokkapati, 2022 WL 2817840, at *6 (internal quotations and citation omitted); see also, e.g., Meyou v. Dep't of State, No. 21-2806, 2022 WL 1556344, at *3–4 (D.D.C. May 17, 2022) (finding that 29-month wait time weighed in favor of dismissal of unreasonable-delay claim). The delay in this case has yet to cross the line from reasonable to unreasonable.

In any event, "a finding that delay is unreasonable does not, alone, justify judicial intervention." In re Barr Lab'ys, Inc., 930 F.2d 72, 75 (D.C. Cir. 1991). Even were Plaintiffs correct that the admittedly lengthy delay in adjudicating their I-526 form was unreasonable, the balance of the first two TRAC factors would still tip in Defendants' favor.

2. *Effects of Delay (Factors 3 and 5)*

The third TRAC factor looks to whether "human health and welfare are at stake"— in which case judicial intervention is more justified — and the fifth assesses the "nature and extent of the interests prejudiced by delay." TRAC, 750 F.2d at 80. Plaintiffs assert that they are experiencing "financial hardship" because their "EB-5 investment capital remain[s] 'at risk'" and they are "limited in obtaining credit from U.S. lenders." Am. Compl., ¶¶ 100–01. The financial risks the Da Costas undertook are "inherent in the [I-526] application process." Fangfang Xu v. Cissna, 434 F. Supp. 3d 43, 54 (S.D.N.Y. 2020). Those concerns therefore do nothing for them here.

They add, however, that so long as their application remains pending, they must remain with their children in Durban, where residents "fear for their lives each time they venture out their front door." Am. Compl., ¶¶ 3, 79. Indeed, residents' access to drinking water, electricity,

20

and other public services is substantially limited there.  Id., ¶¶ 81–84.  Such threats to the Da

Costa family's "health and welfare" are meaningful and thus do place factors three and five in

their column.

### 3.  *Competing Priorities (Factor 4)*

The fourth factor examines "the effect of expediting delayed action on agency activities

of a higher or competing priority."  TRAC, 750 F.2d at 80.  Here, that factor plainly weighs in

Defendants' favor.  As is often the case, it also carries the greatest weight.  Milligan v. Pompeo,

502 F. Supp. 3d 302, 319 (D.D.C. 2020).

The parties agree that post-Integrity Act, USCIS has been processing I-526 forms for the

Regional Center Program — it just has yet to get to the Da Costas' form.  See Am. Compl., ¶ 96.

Were this Court to grant them relief, it would thus be directing the agency to divert resources

away from other petitions of competing priority and bump Plaintiffs to the front of the line.  See

MTD at 14.  There would be no "net gain" in the processing of I-526 forms.  See MTD at 15.

Factor four thus leans heavily in Defendants' favor, and it carries substantial weight: "This

Circuit has refused to grant relief, even though all the other factors considered in TRAC favored

it, where a judicial order putting the petitioner at the head of the queue would simply move all

others back one space and produce no net gain."  Milligan, 502 F. Supp. 3d at 319 (quoting

Mashpee, 336 F.3d at 1100) (alterations and internal quotations omitted).

Plaintiffs' sole response is to speculate that there may not be a "queue" for I-526

petitions.  Without discovery, they insist, this Court cannot assess "whether there is a line" or

"what modicum of harm would result if Plaintiffs received an adjudication" now.  See Opp. at

24.  The Court disagrees.  The existence of a backlog of I-526 petitions is unfortunately not

hypothetical.  See, e.g., USCIS, USCIS Announces New Actions to Reduce Backlogs, Expand

Premium Processing, and Provide Relief to Work Permit Holders (Mar. 29, 2022),

https://perma.cc/NBW4-6ZAQ.  Indeed, Plaintiffs' Complaint, which speculates that USCIS has

allegedly "approved thousands of later filed I-526 petitions" before adjudicating theirs, see Am.

Compl., ¶ 96, presupposes the existence of such a processing line.

This weighty factor thus plainly militates in favor of dismissal.

4.  *Agency Impropriety (Factor 6)*

Plaintiffs make no concrete allegations of impropriety by the agency.  They merely

speculate, based on an assertion that there is "no rational or benign explanation" for the delays in

processing, that discovery might uncover some unsavory activity by USCIS.  See Am. Compl.,

¶¶ 192, 195.  Speculation cannot sustain a claim at the motion-to-dismiss stage.  Twombly, 550

U.S. at 555.  The Court sees no other basis for allegations of "lurking" impropriety, particularly

given USCIS's efforts to reduce adjudication times.  See MTD at 11 (noting efforts to fill

vacancies in Investor Program Office, which processes EB-5 applications).  The sixth TRAC

factor thus weighs in favor of Defendants or is at least in equipoise.

\*        \*        \*

The Court recognizes the difficulties that Plaintiffs have faced in awaiting an adjudication

on their petition, and it does not make light of the time that has elapsed since they submitted their

Form I-526.  Their wait time, which is now approaching three years, is consequential.  But under

the TRAC analysis, that is not sufficient to justify judicial relief.  Particularly given that factors

one, two, and four so strongly favor Defendants, this Court is constrained to find that the balance

of factors weighs against judicial intervention.

**IV.    Conclusion**

For the foregoing reasons, the Court will grant the Motion to Dismiss.  A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  November 16, 2022